**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **COLORADO WILD HORSE AND BURRO COALITION, INC., <u>et al.</u>,** | |
| Plaintiffs, | |
| v. | Case No. 15-cv-01454 (CRC) |
| **SALLY JEWELL, <u>et al.</u>,** | |
| Defendants. | |

---

<u>**MEMORANDUM OPINION**</u>

*"[They] have [their] freedom, but [they] don't have much time."*[1]

So it is for a group of wild horses that, beginning tomorrow, are scheduled to be removed from two tracts of federal rangeland in northwest Colorado.  The roundup follows a July 28, 2015 decision by the U.S. Interior Department's Bureau of Land Management ("BLM") to remove 167 wild horses from contiguous sections of Colorado's White River Resource Area: the West Douglas Herd Area ("West Douglas HA") and the Piceance-East Douglas Herd Management Area ("East Douglas HMA").  Finding the number of horses too high to maintain ecological balance and sustain multipurpose land use in those areas, BLM invoked its authority under the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act"), 16 U.S.C. §§ 1331 <u>et seq.</u>, to declare those horses to be "excess animals" and remove them from the land.  This removal process, also known as a "gather," consists of transferring excess horses from the wild and then euthanizing those that are old, sick, or lame, and adopting out or selling as many remaining horses as possible.  <u>Id.</u> § 1333(b)(2).  Plaintiffs—organizations dedicated to protecting

---

[1] The Rolling Stones, "Wild Horses" (Rolling Stones Records 1971).

wild horses and individuals who enjoy observing wild horses in their natural habitat—challenge BLM's "excess" determinations and its decision to remove these horses.  They ask this Court to enjoin BLM's planned gather, currently scheduled to begin tomorrow, September 16, 2015.

In support of their Motion for a Preliminary Injunction, Plaintiffs allege violations of both the Wild Horses Act and the National Environmental Policy Act ("NEPA").  Plaintiffs claim that BLM violated the Wild Horses Act in two ways: by finding all horses in the West Douglas HA to be "excess" (and therefore subject to removal), and by using empirically deficient estimates to calculate the total wild-horse populations in both areas.  Plaintiffs further contend that BLM violated NEPA both by failing to consider the reasonably foreseeable cumulative effects of its proposed West Douglas HA gather and by relying on an outdated and inapplicable Environmental Assessment ("EA") to support a gather in and around the neighboring East Douglas HMA.

Because the Wild Horses Act authorizes BLM's excess determination and BLM appears to have used reasonable methods to estimate the total wild-horse population, the Court finds that Plaintiffs are unlikely to prevail on their Wild Horses Act claims.  And because the record reflects that BLM considered the cumulative effects of the proposed gather and permissibly relied on the EA written for a previous East Douglas HMA gather, the Court finds that Plaintiffs are also unlikely to prevail on their NEPA claims.  The Court further finds that Plaintiffs are unlikely to suffer irreparable harm as a result of the gather and that the balance of equities and the public interest weigh in favor of BLM.  Accordingly, the Court will deny Plaintiffs' Motion for a Preliminary Injunction.

## I.    Background

Congress enacted the Wild Horses Act in 1971 out of solicitude for unclaimed horses and burros roaming on the public lands, which it extolled as "living symbols of the historic and pioneer spirit of the West."  16 U.S.C. § 1331.  The Act (as later amended in 1978) entrusts the Secretary of the Interior—and through her, BLM—with preserving these animals in their native rangelands, while also ensuring that thriving wild-horse populations not disrupt the "natural ecological balance of all wildlife species which inhabit such lands."  16 U.S.C. § 1333(a).  BLM is therefore directed to set "appropriate management levels" ("AMLs")—optimal population ranges—for horses inhabiting the public lands, regularly inventory these animals to determine whether an "overpopulation" exists, and "immediately remove" such "excess animals" as necessary.  16 U.S.C. § 1333(b)(1)-(2).

This case centers on BLM's management efforts in the White River Resource Area, a large swath of public land in northwest Colorado.  BLM completed its first land-use plan for the White River Resource Area in 1975, at which time the area was subdivided into two "herd units" for analysis of the lands' potential for sustaining healthy wild-horse populations in the long term.  Defs.' Opp'n Ex. 3 ("2015 West Douglas HA EA"), App. C at 6.  The 188,142-acre Douglas Creek Herd Unit shared its eastern border with the slightly larger Piceance Basin Herd Unit, which contained 247,615 acres.  Id.  In 1986, BLM revised its herd-unit identifiers to reflect which portions of the White River Resource Area had been selected for long-term management.  The territory not so chosen was split into two "herd areas": the West Douglas HA and the Piceance North HA.  Id. at 19.  The portion of the original herd units that BLM had concluded *could* sustain healthy wild-horse populations was renamed the Piceance-East Douglas Herd Management Area.  Id.

BLM has since implemented divergent management philosophies for the East Douglas HMA and those sections of the White River Resource Area that it deemed inhospitable to the maintenance of wild-horse populations in balance with other uses.  BLM's current AML for the East Douglas HMA—a population of 135 to 235 wild horses—was established in 2002 "following an in-depth analysis of habitat suitability, resource monitoring and population inventory data."  Defs.' Opp'n Ex. 4 ("2011 East Douglas HMA EA") at 2.  The current AML for wild horses in the West Douglas HA is *zero*, because the agency concluded that the West Douglas HA could not sustain a healthy wild-horse population consistent with BLM's duty to preserve ecological balance and multipurpose land use.  2015 West Douglas HA EA, App. C at 30.

BLM last conducted an aerial census of wild horses in the White River Resource Area in February 2012.  That inventory indicated 154 horses within, and 36 immediately outside, the West Douglas HA, 2015 West Douglas HA EA at 27, and 183 wild horses within, and 34 immediately outside, the East Douglas HMA, Defs.' Opp'n Ex. 7 ("2015 East Douglas HMA Finding of No Significant Impact") at 1.  On the basis of a 20 percent foal-crop multiplier, BLM estimates that 291 horses presently reside in, and 74 immediately outside, the West Douglas HA.  2015 West Douglas HA EA at 2.  BLM similarly estimates that there are currently 377 wild horses in, and 74 in areas adjacent to, the East Douglas HMA.  2015 East Douglas HMA FONSI at 1.

BLM now proposes to gather and remove up to 167 wild horses from the West Douglas HA and immediately surrounding areas where horses have recently wandered, and the remainder (if necessary) from in and around the East Douglas HMA.  Defs.' Opp'n Ex. 9 ("2015 East Douglas HMA Decision Record") at 1.  The agency has explicitly determined that "all wild

horses within or adjacent to the [West Douglas] HA meet the statutory definition of excess animals," 2015 West Douglas HA EA at 2, and that those East Douglas horses exceeding the AML's upper limit of 235 are an "excess wild horse population," 2015 East Douglas HMA DR at 3. After BLM's White River Field Office sent a scoping letter to interested parties and responded to public comments received during the spring of 2015, the agency addressed the likely environmental impacts of its proposed West and East Douglas gathers by issuing a Finding of No Significant Impact ("FONSI") for both areas on July 28, 2015. BLM's West Douglas FONSI was accompanied by a contemporaneously produced EA, but the agency relied on an EA from 2011 to justify the issuance of a FONSI as to the East Douglas HMA. 2015 East Douglas HMA FONSI at 2. BLM also published concise Decision Records ("DRs") for its proposed removal of West and East Douglas horses. BLM's gather was scheduled to begin on September 14, 2015.

This case has proceeded at a gallop. On September 4, 2015, nearly five weeks after BLM issued its final decision to proceed with the gather, Plaintiffs filed suit against the Secretary of the Interior and several BLM officials. Two days later, over the Labor Day holiday weekend and with just over a week until the gather was scheduled to take place, Plaintiffs filed a motion seeking a preliminary injunction to halt the roundup. The Court held a telephonic conference on September 9, 2015, in which it discussed with the parties the possibility of postponing the gather to allow for thorough briefing and consideration of the issues. During the telephonic conference, the Government informed the Court that BLM had agreed to postpone the gather by two days, to September 16, 2015. According to BLM, any additional delay would seriously undermine the agency's ability to complete the gather successfully. After an extremely expedited briefing schedule, the Court held an evidentiary hearing and heard oral argument on Plaintiffs' motion on

September 11, 2015.  At the hearing, the Court received testimony from Linda Hanick and

Plaintiff Barbara Flores—two wild-horse enthusiasts who have traveled to the White River

Resource Area and observed past BLM gathers—as well as from Kent Walter, the Manager of

BLM's White River Field Office.

## II.      Standard of Review

A preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter

v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008).  In order to obtain a preliminary injunction to

prevent BLM from conducting its planned roundup, Plaintiffs must establish that they are "likely

to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the

public interest."  Id. at 20.  The D.C. Circuit has indicated that, even after the Supreme Court's

decision in Winter, "[a] district court must balance the strength of a plaintiff's arguments in each

of the four elements when deciding whether to grant a preliminary injunction."  Mills v. District

of Columbia, 571 F.3d 1304, 1308 (D.C. Cir. 2009).  Nonetheless, "it is especially important for

the movant to demonstrate a likelihood of success on the merits."  Nat'l Head Start Ass'n v. U.S.

Dep't of Health & Human Servs., 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (citing Davenport v.

Int'l Bhd. of Teamsters, 166 F.3d 356, 360, 366 (D.C. Cir. 1999)).

## III.     Analysis

### A.    Likelihood of Success on the Merits

Plaintiffs challenge the proposed gather in four main respects.  First, they insist that the

Wild Horses Act forbids BLM from designating all horses in the West Douglas HA as "excess

animals."  Second, they contend that BLM acted arbitrarily and capriciously, in violation of the

Administrative Procedure Act, by failing to obtain more-current population figures before

rendering its "excess" determinations for wild horses in both the West Douglas HA and East Douglas HMA.  Third, Plaintiffs argue that BLM's issuance of a FONSI as to the proposed West Douglas HA gather was also arbitrary and capricious.  Finally, they claim that BLM violated NEPA by relying on a stale and inapposite EA to justify its removal of horses from the East Douglas HMA.  The Court will address each claim in turn.

    1.  <u>BLM's Designation of All West Douglas HA Horses as "Excess"</u>

  The Wild Horses Act places all free-roaming wild horses and burros under the jurisdiction of the Secretary of the Interior for purposes of managing them in conformity with the Act.  16 U.S.C. § 1333(a).  BLM—on behalf of the Secretary—is directed to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on public lands."  <u>Id.</u> §§ 1332(a), 1333(a).  Rather than privilege any one resource above others, BLM must employ a "multiple-use management concept for the public lands."  <u>Id.</u> § 1332(c).  As Plaintiffs emphasize, Congress expressed its desire—in the Act's "Declaration of Policy"[2]—that wild horses be "protected from capture, branding, harassment, or death" and also "be considered in the area where presently found [i.e., in 1971], as an integral part of the natural system of the public lands."  16 U.S.C. § 1331.  But horses are only one ingredient of the public lands' ecological makeup.  Congress amended the Wild Horses Act in 1978 to reflect this fact—as the D.C. Circuit has explained, "[t]he main thrust of [those] amendments is to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume."  <u>Am. Horse Prot. Ass'n v. Watt</u>, 694 F.2d 1310, 1316 (D.C. Cir. 1982).

---

[2] The D.C. Circuit has explained that although statutory preambles "contribute[] to a general understanding of a statute," the only "operative provisions of statutes are those which prescribe rights and duties."  <u>Ass'n of Am. R.Rs. v. Costle</u>, 562 F.2d 1310, 1316 (D.C. Cir. 1977).

BLM must "maintain a current inventory" of wild horses in order to determine an AML for them—essentially, the most sensible population range for a given resource area.  16 U.S.C. § 1333(b)(1).  The inventory is designed to help BLM decide "whether and where an overpopulation exists" and whether to achieve AMLs by removing "excess animals" or by taking some other action.  Id.  "[E]xcess animals" are defined, in relevant part, as those horses "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in [an] area."  16 U.S.C. § 1332(f).  On the one hand, BLM must manage each component resource (including wild horses) "at the minimal feasible level."  Id. § 1333(a).  Yet when BLM concludes, "on the basis of all information currently available to [it], that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," it must "immediately remove excess animals from the range so as to achieve [AMLs]," "restore a thriving ecological balance," and "protect the range from the deterioration associated with overpopulation."  Id. § 1333(b)(2).

In 2007, BLM determined that the West Douglas HA habitat could not support a self-sustaining population of wild horses over the long term, and so it declared all wild horses in that area to be "excess animals" subject to immediate removal under the Act.  2015 West Douglas HA EA, App. C at 30.  The scheduled gather of up to 167 horses in and around the West Douglas HA would partially implement that decision.  Plaintiffs argue that BLM is statutorily prohibited from declaring all West Douglas HA horses "excess" and thus immediately removable.  Pls.' Mot. Prelim. Inj. 19–20.  After all, the Wild Horses Act exhorts BLM to consider wild horses an "integral" resource in the "area" where they were found in 1971, and to protect them from "capture, branding, harassment, or death."  16 U.S.C. § 1331.  According to Plaintiffs,

transferring an entire herd from its historic environs would "forever destroy[]" Congress's contemplated ecological balance on the public lands.  Pls.' Mot. Prelim. Inj. 20.

But BLM's early implementation of the Wild Horses Act strongly undercuts Plaintiffs' contention that BLM has proposed to eliminate an entire group of wild horses from the "area" they inhabited in 1971.  After BLM first inventoried the White River Resource Area in 1974 and formulated a land-use plan for it in 1975, it divided the surveyed territory into two "herd units": the Piceance Basin Herd Unit and the Douglas Creek Herd Unit.[3]  2015 West Douglas HA EA, App. C at 6.  All of the present-day West Douglas HA is contained within the original Douglas Creek Herd Unit, but a significant portion of that Unit has since been designated the East Douglas HMA, which BLM considers a more suitable habitat for wild horses.  Id.; Defs.' Opp'n 31.  Not until 1986 did the section of the Douglas Creek Herd Unit deemed unfit for long-term management become known as the West Douglas Herd Area.  2015 West Douglas HA EA at 119.  So, contrary to Plaintiffs' assertions, BLM's determination that all of the horses in the West Douglas HA are "excess" will not result in the "zeroing out" of the horses in "the area" in which they were found at the time of the passage of the Wild Horses Act.  Indeed, much of that original area is now contained within the East Douglas HMA, where BLM will continue to manage wild horses.  At the very least, BLM's decision to interpret the statutory term "the area" by reference to the earliest geographic classifications it used after the Act's passage is a permissible reading of the statutory text.  It is therefore entitled to controlling deference under Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).

---

[3] A map of the earliest wild-horse inventory, showing the two original herd units within the White River Resource Area as of 1974, is attached to this Memorandum Opinion as Appendix A. A map reflecting the current boundaries of the herd areas and herd-management area within the White River Resource Area is attached as Appendix B.

Even if Plaintiffs were correct that the West Douglas HA is the appropriate analytical unit, there is no inherent reason why BLM could not have declared all wild horses in that area to be "excess animals" subject to immediate removal.  BLM is charged with maintaining "a thriving natural ecological balance on the public lands," an emphatically "multiple-use" mission. 16 U.S.C. §§ 1332(c), 1333(a).  "Excess" animals are those that "must be removed" in order to preserve such a harmonious balance.  Id. § 1332(f).  The Wild Horses Act does not define "appropriate management level," instead authorizing BLM to "determine" both the AMLs and how they should be achieved.  Id. § 1333(b)(1).  Moreover, nothing in the Act forbids BLM from concluding that the depletion of other resources has rendered an entire herd area unsuitable for equine habitation.  See Dahl v. Clark, 600 F. Supp. 585, 595 (D. Nev. 1984) (observing that "[t]he benchmark test is thriving ecological balance," not "any specific numbers of animals"); Am. Horse Prot. Ass'n v. Frizzell, 403 F. Supp. 1206, 1217 (D. Nev. 1975) (noting that BLM is "given a high degree of discretionary authority for the purposes of protection, management, and control of wild free-roaming horses") (quoting 1971 U.S.C.C.A.N. 2159, 2160).  BLM's conclusion that the Wild Horses Act permits it to declare all West Douglas HA horses "excess"—as long as it does so in a procedurally proper manner—is therefore entitled to Chevron deference.  As a result, Plaintiffs would not likely prevail on the merits of this claim.

       2.       Sufficiency of the Data Underlying BLM's West Douglas HA and East Douglas HMA "Excess" Determinations

Plaintiffs further contest the adequacy of BLM's decisionmaking process in declaring all West Douglas HA horses, and some East Douglas HMA horses, to be "excess."  Plaintiffs argue that BLM cannot validly declare either area overpopulated until it more rigorously measures the actual populations of the West Douglas HA and the East Douglas HMA.  Compl. 31.  Both sides agree that BLM has not aerially inventoried the White River Resource Area since February 2012.

2015 West Douglas HA EA at 27.  Applying scientifically informed assumptions about annual

foal-crop rates and deaths in wild-horse populations, BLM estimates that there are currently 291

horses within the West Douglas HA, 74 horses immediately adjacent to it, 377 horses inside the

East Douglas HMA, and 74 horses immediately outside it.  2015 West Douglas HA EA at 2;

2015 East Douglas HMA FONSI at 1.

     Plaintiffs insist that BLM is not acting on the basis of a "current inventory," 16 U.S.C. §

1333(b)(1), because it has not established the reliability of its annual population multiplier.

According to BLM's own internal guidance document, proper wild-horse management requires

"[a]n accurate and current assessment of . . . population size, growth rate, and distribution."

Wild Horses and Burros Management Handbook, H-4700-1, at 33 (2010), available at

http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_

handbook.Par.11148.File.dat/H-4700-1.pdf.  Yet BLM has fallen short of the standard to which it

aspires:  "At a minimum, population surveys should be conducted every 2 years whenever

possible, and within 6–12 months prior to establishing the need to gather and remove excess

[animals]."  Id.  BLM's willingness to extrapolate from 2012 population data clashes with this

self-imposed goal.

     Nonetheless, BLM has not imposed a legal duty on itself merely by setting a target for

the frequency of its population inventories.  BLM's population estimates—and therefore its

"excess" determinations—are statutorily unauthorized only if they are arbitrary or capricious

under the Administrative Procedure Act.  Watt, 694 F.2d at 1319.  Plaintiffs cannot prevail on

this claim unless BLM "has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs.</u> <u>Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). The Wild Horses Act, moreover, contemplates that current inventories may not always be available, as it entitles BLM to act "on the basis of all information currently available to [it]." 16 U.S.C. § 1333(b)(2).

In the Court's view, the 20 percent annual population growth rate BLM has selected appears to be a reasonable choice grounded in the best available data. That figure is supported by a 2013 National Academy of Sciences report that concluded, after an exhaustive survey of the literature, that "a mean annual population growth rate in the free-ranging western horse population approaching 20 percent is a reasonable approximation." Defs.' Opp'n Ex. 1 ("Walter Declaration"), Attach. A at 63. Previous population survey data also support the reliability of BLM's preferred 20 percent multiplier. Of the eleven aerial censuses conducted in the White River Resource Area from 1981 to 2012, five reflected an annual growth rate of over 20 percent since the last inventory, and six of under 20 percent, with roughly similar upward and downward variations. 2015 West Douglas HA EA, App. C at 31. Available survey data for the East Douglas HMA suggest a mean compounding rate of 16.2 percent over time. 2011 East Douglas HMA EA at 61. BLM's 20 percent population multiplier for the entire White River Resource Area is therefore a sensible approximation supported by the available empirical evidence.

Nor does it appear that BLM has "entirely failed to consider" important statutory factors or rendered an "implausible" determination of excess. <u>See</u> Defs.' Opp'n 10–13 (detailing BLM's extensive superintendence of the White River Resource Area since the Wild Horses Act's passage, including consideration of alternative management strategies). As to the West Douglas HA, BLM cites "[c]oncentrated overutilization of vegetation," "vulnerab[ility] to further

deterioration," and the possibility of "long term degradation and reduced sustainability of rangeland resources." 2015 West Douglas HA EA, App. D at 4–5. BLM has similarly based its East Douglas HMA excess determination on "evaluations of resource conditions, vegetation utilization, wild horse inventory data, livestock permitted use, livestock actual use reports, wildlife population data, and land use planning allocations." 2015 East Douglas HMA EA at 3. BLM's comprehensive assessment of important statutory factors indicates that its "excess" determination for the West Douglas HA was neither arbitrary nor capricious. Because the Court concludes that both determinations appear to be authorized by the Wild Horses Act, Plaintiffs would not likely prevail on the merits of this claim.[4]

3.    <u>Plaintiffs' First NEPA Claim: The West Douglas HA FONSI</u>

Plaintiffs next contend that BLM violated NEPA by failing to "analyze the cumulative impacts of the planned removal of all remaining wild horses from the [West Douglas] HA" before issuing a FONSI for the scheduled West Douglas HA gather. Pls.' Mot. Prelim. Inj. 18. Under NEPA, federal agencies must issue an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). Council on Environmental Quality ("CEQ") regulations specify ten factors agencies must consider in evaluating the "intensity" of a proposed action (an aspect of "significance"), including "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts" that are "reasonable to anticipate." 40 C.F.R. § 1508.27. Mandating consideration of cumulative impacts ensures that agencies do not escape

_____

[4] Because Plaintiffs' Wild Horses Act claim would likely fail, so too would their Federal Land Policy and Management Act claim, which assumes that BLM has acted "in derogation of" land-use policies established by "other provisions of law" (here, the Wild Horses Act). 43 U.S.C. § 1701(b).

accountability for "individually minor but collectively significant actions taking place over a period of time." Id. § 1508.7. Plaintiffs assert that even though BLM proposes to remove at most 167 horses from the West Douglas HA starting on September 16, the complete removal of wild horses from that area is "reasonably foreseeable" under a management regime that classifies all West Douglas HA horses as "excess." Id.

In lieu of preparing an EIS, an agency may issue a document (known as a "FONSI") "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment." Id. § 1508.13. A FONSI must reference the "evidence and analysis" for a finding of no significant impact contained in an associated EA. Id.; Id. § 1508.9. The EA itself must discuss "the environmental impacts of the proposed action and alternatives." Id. § 1508.9. An agency's issuance of a FONSI may be overturned only if it was arbitrary or capricious, meaning that the agency "must have taken a 'hard look' at the problem in preparing the EA." Grand Canyon Trust v. F.A.A., 290 F.3d 339, 340–41 (D.C. Cir. 2002) (quoting Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120, 126 (D.C. Cir. 1985)). NEPA also encourages agencies to "tier" their environmental analyses so as to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for discussion." 40 C.F.R. § 1502.20. In other words, a later EA "need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference," "concentrat[ing] on the issues specific to the subsequent action." Id. Tiered documents "must include a finding that the conditions and environmental effects described in the broader NEPA document are still valid," or else "address any exceptions." 43 C.F.R. § 46.140. A FONSI may then be issued "so long as any previously unanalyzed effects are not significant." Id.

This is precisely what BLM has done in its 2015 EA for the West Douglas HA.  In that document, BLM "analyze[s] the environmental consequences of the methods used to gather [up to 167] excess wild horses in the [West Douglas] HA."  2015 West Douglas HA EA at 2.  This analysis itself is quite exhaustive.[5]  The 2015 West Douglas HA EA is also explicitly tiered to the 2005 West Douglas HA Amendment to the White River Resource Management Plan, which examined—in comparable detail—the expected environmental consequences of completely "remov[ing] all wild horses from the [West Douglas] Herd Area" and adjacent areas by 2007. 2015 West Douglas HA EA at 29.  The 2015 West Douglas HA EA "incorporated [that analysis] by reference in its entirety" and clarified that the environmental conditions and effects described in 2005 are still valid, with four exceptions that "do not substantially alter th[ose] effects."  2015 West Douglas HA EA at 24.  This is hardly the handiwork of an agency seeking to disguise "individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.  Because BLM clearly seems to have taken a "hard look" at the statutorily relevant impacts of its proposed removal of up to 167 horses in and around the West Douglas HA, it is unlikely that Plaintiffs would prevail on the merits of their first NEPA claim.

---

[5] For example, BLM discusses the environmental consequences of four proposed gather and removal methods, as well as three alternative techniques that it decided not to explore more fully. 2015 West Douglas HA EA at 9–18.  It consulted—and appears to have fully considered—the Colorado BLM's Standards for Public Land Health, which encompass the issues of "upland soils, riparian systems, plant and animal communities, threatened and endangered species, and water quality."  Id. at 7, 77.  BLM articulated the assumptions underlying its chosen removal strategy and analyzed the direct, indirect, and cumulative effects of that strategy (and the rejected alternatives) on wild horses, vegetation, livestock grazing, terrestrial wildlife, threatened or endangered species, migratory birds, aquatic wildlife, non-native species, cultural resources, paleontological resources, human recreation, and a federal wilderness-study area.  Id. at 23–77. It also individually justified its decisions not to discuss twenty possible categories of environmental concern more exhaustively.  Id. at 20–22.

4.      Plaintiffs' Second NEPA Claim: The East Douglas DNA

Plaintiffs lastly complain that BLM has attempted to satisfy its NEPA obligations as to the proposed East Douglas HMA removal through a "BLM-construct" known as a "Determination of NEPA Adequacy" ("DNA"), rather than through one of two NEPA-compliant prerequisites: an EIS or EA.  Pls.' Mot. Prelim. Inj. 12; see also 40 C.F.R. § 1501.4 (specifying when a federal agency must prepare an EIS).  In fact, BLM predicated its FONSI for the scheduled East Douglas HMA removal on the analysis contained in its 2011 EA for the East Douglas HMA.  2015 East Douglas HMA FONSI at 2.  This FONSI—which is a recognized type of "environmental document," 40 C.F.R. § 1508.10—explicitly incorporates by reference the DNA's analysis and conclusion that the 2011 EA satisfies BLM's NEPA obligations as to the proposed East Douglas HMA removal.  2015 East Douglas HMA FONSI at 2.  The issue, therefore, is not whether BLM has acted improperly merely by issuing a "Determination of NEPA Adequacy," whose name appears nowhere in NEPA or the corresponding CEQ regulations.[6]  It is whether BLM may rely on a four-year-old EA for a present-day gather and removal when (1) the action justified by the 2011 EA has already been completed, and (2) the proposed gather area includes territory not analyzed in the 2011 EA.

Neither of these features necessarily dooms BLM's proposed East Douglas HMA gather. As previously discussed, agencies are expressly "encouraged to tier" their environmental-impact analyses "to eliminate repetitive discussions of the same issues."  40 C.F.R. § 1502.20.  BLM's 2015 East Douglas HMA DNA and FONSI are therefore permissible as long as they "include[d] a finding that the conditions and environmental effects described in the [2011 EA] are still valid"

---

[6] After all, BLM could have simply bypassed this extra step and included all information related to NEPA compliance directly in its East Douglas HMA FONSI.

16

or explain why "any previously unanalyzed effects are not significant."  43 C.F.R. § 46.140.  In

its 2015 East Douglas HMA DNA, BLM asserts that "the effects of implementing the Proposed

Action are similar to those analyzed in the existing [2011 EA]," as its contractor would "use the

same gather techniques in [essentially] the same area."  2015 East Douglas HMA DNA at 7–8.

The Court has little basis for questioning this finding, given the reasonableness of BLM's

population-growth modeling and the likely adequacy of its 2015 "excess" determination for the

East Douglas HMA, which stemmed from an AML calculation and land-use framework that

have been in place since well before 2011.  BLM also proposes to expand the geographic scope

of its 2011 gather by 5.7 percent to account for horses that have wandered to areas immediately

outside the East Douglas HMA.[7]  Defs.' Not. of Clarification 3.  Again, BLM insists that "[t]he

impacts associated with gather and removal of excess wild horses within these areas are similar

to those already disclosed."  2015 East Douglas HMA DNA at 8.  The Court hesitates to reject

this finding of topographical and ecological similarity, given the proposed gather's modest

territorial expansion and the adjacent lands' contiguity with the previously analyzed East

Douglas HMA.

        At least one other court has upheld the tiering of DNAs to previous EAs in the context of

gathering and removing wild horses.  In Friends of Animals v. U.S. Bureau of Land

Management, 2015 WL 803169 (D. Utah Feb. 26, 2015), the court refused to enjoin a proposed

BLM gather and removal in Utah because it found that two EAs issued seven and five years

earlier were "fully applicable to the proposed action."  Id. at *4.  As here, those earlier EAs had

analyzed identical gather and removal methods for significantly larger (and completed)

_____

[7] A map juxtaposing the earlier-analyzed acreage and the additional gather area is attached to this
Memorandum Opinion as Appendix C.

operations, where no "new information or circumstances . . . convey[ed] a different picture of the affected environment." Id. see also S. Utah Wilderness Alliance v. Norton, 457 F. Supp. 2d 1253, 1261–62 (D. Utah 2006) (noting that DNAs alone cannot justify the issuance of FONSIs, but "are used to determine the sufficiency of previously issued NEPA documents"). And although Plaintiffs characterize DNAs as an unorthodox "BLM-construct," Pls.' Mot. Prelim. Inj. 12, courts have not reacted with such reflexive suspicion in the similar context of supplementing NEPA documents for ongoing agency actions. See, e.g., W. Watersheds Project v. Jewell, 601 Fed. App'x 586, 587 (9th Cir. 2015) ("BLM adequately explained its decision not to prepare a supplemental EIS in its Determination of NEPA Adequacy.").

Plaintiffs cite just one decision forbidding the use of a DNA (or similar document) that relied on the analysis of an EA for a previously completed action. The court in Friends of Animals v. U.S. Bureau of Land Management, 2015 WL 555980 (D. Nev. Feb. 11, 2015), found an "insufficient legal basis" for BLM to rely on a five-year-old EA to support a proposed wild-horse roundup in Nevada earlier this year. Id. at *3. And rightly so—that action would have "far exceed[ed] the intensity and scope" of the one analyzed earlier. Id. When agencies tier environmental analyses, no further explanation is necessary only when "the impacts of [a] narrower action are identified and analyzed in [a] broader NEPA document." 43 C.F.R. § 46.140 (emphasis added). Here, BLM has proposed to remove between zero and 167 East Douglas HMA horses, depending on how many horses it is able to gather first in the West Douglas HA. 2015 East Douglas HMA DR at 1. The 2011 East Douglas HMA EA analyzed the impact of gathering and removing much larger numbers of wild horses—382 and 247, respectively. 2011 East Douglas HMA DR at 1. Because BLM clearly seems to have taken a

"hard look" at the available evidence and the alternatives to its proposed action, it is unlikely that Plaintiffs would prevail on the merits of their second NEPA claim.

      B.    <u>Irreparable Harm</u>

     An injunction is appropriate only if the applicant has demonstrated irreparable harm—that is, the inadequacy of legal remedies. <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 990 F. Supp. 2d 9, 38 (D.D.C. 2013). "The party seeking injunctive relief must demonstrate that the claimed injury is 'both certain and great.'" <u>Id.</u> at 38–39 (quoting <u>Wis. Gas Co. v. Fed. Energy Reg. Comm'n</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)). The moving party must also "show that '[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" <u>Wis. Gas Co.</u>, 758 F.2d at 674 (quoting <u>Ashland Oil, Inc. v. FTC</u>, 409 F. Supp. 297, 307 (D.D.C. 1976), <u>aff'd</u>, 548 F.2d 977 (D.C. Cir. 1976)). Plaintiffs must present the Court with enough evidence to "substantiat[e]" their claim of irreparable injury. <u>Id.</u>

     Plaintiffs identify two primary ways in which they would suffer irreparable harm in the absence of a preliminary injunction. First, Plaintiffs claim that the gather "will vastly decrease the number of horses[,] . . . minimizing future opportunities to view and interact with the herd[s] and disrupting Plaintiffs' intimate connection with these horses." Pls.' Mot. Prelim. Inj. 25. Second, Plaintiffs claim that they will suffer emotional distress as a result of observing the gather and contemplating "the lasting trauma inflicted on the . . . wild horses" during the removal process. <u>Id.</u> Plaintiffs add that BLM's alleged violation of NEPA, combined with the environmental or aesthetic injuries they will suffer, strengthens the claim that their injury would be irreparable. <u>Id.</u> Defendants counter that "it is likely . . . there will be a significant number of horses remaining [in the West Douglas HA] after the initial gather," especially given the

difficulty of gathering horses in that area, and that "even assuming . . . all wild horses will be removed from the West Douglas HA, there will still be wild horses in the nearby Piceance-East Douglas HMA." Defs.' Opp'n 42. According to Defendants, the horses in East Douglas are descended "from the same herd identified in 1974 on the range," meaning that "[t]hose horses will be available to satisfy any interest Plaintiffs may claim in viewing" the same group of horses with which they may feel a personal connection. Id.[8]

As a preliminary matter, the consequences of BLM's gather operation in the West Douglas HA are unlikely to be as dire as Plaintiffs contend. After all, there is no guarantee that BLM will succeed in rounding up all 167 horses during its planned gather in that area. According to Kent Walter, Manager of BLM's White River Field Office, "[h]istory shows that the [West Douglas] HA is an extremely difficult area [in which] to capture wild horses because of its remote nature, rugged and mountainous terrain, dense tree and brush cover and limited road access." Walter Decl. ¶ 10. As a result of these challenging conditions, a 2006 gather in the West Douglas HA succeeded in rounding up just over 40 percent of the horses for which BLM had planned. See id. (explaining that BLM was able to remove only 37 of the 89 horses

---

[8] Defendants also argue that Plaintiffs' delay in bringing their motion undermines their claim that emergency relief is necessary. The Court is indeed troubled by the delay. Plaintiffs—who were closely involved in the planning process and have mounted legal challenges to prior gathers— were aware that BLM intended to undertake this gather well before the agency announced its final decision on July 28, 2015. Even then, Plaintiffs waited 42 days to file their emergency motion and did so during a holiday weekend, with just over a week until the gather was scheduled to begin. While Plaintiffs may have been within their rights to file their lawsuit when they did, their delay is to blame for the limited time the Court has had to consider the important issues their suit raises. This is not first time several of these Plaintiffs have been dilatory in challenging a BLM gather. See Habitat for Horses v. Salazar, 745 F. Supp. 2d 438, 449 (S.D.N.Y. 2010) (declining to find that Plaintiffs' 30-day delay in bringing suit undermined their claim of irreparable harm). Nevertheless, because the Court concludes that Plaintiffs have not otherwise established irreparable harm, it need not decide the extent to which Plaintiffs' delay in moving for an injunction weakens their claimed necessity for emergency relief.

targeted in the 2006 roundup).  Unsurprisingly, then, BLM anticipates needing to gather at least

some horses in the East Douglas HMA to meet its 167-horse goal.  Defs.' Opp'n 1–2, 42.  If

BLM is correct in its estimate that 365 wild horses live in or near the West Douglas HA, then the

planned gather will remove (at most) approximately 45 percent of the horse population there.

Because of the difficulty of capturing wild horses in and around the West Douglas HA, the

planned gather will likely remove fewer horses—and potentially many fewer—than BLM hopes.

Even if BLM were to succeed in removing 167 horses from the West Douglas HA, the

Court finds that a sufficient number of horses would likely remain in that area and in the broader

White River Resource Area to satisfy Plaintiffs' interest in observing and enjoying the wild-

horse population in the area where it was originally found.[9]  See Am. Horse Prot. Ass'n, 403 F.

Supp. at 1219 (noting that plaintiffs' interest in having wild horses available for observation

would "not be affected adversely in any significant way" if BLM removed 400 of between 1,000

and 1,200 wild horses from a 385,000-acre area).  Plaintiffs attest that they often visit both the

West Douglas HA and the East Douglas HMA, Decl. of Donald E. Moore ¶ 3, 7; Decl. of Toni

H. Moore ¶ 2, 4, even as part of the very same trip, Decl. of Barbara Flores ¶ 11, 16.  On future

visits to these areas, Plaintiffs will continue to be able to view the horses remaining in both areas

after the gather, albeit with more difficulty than in the past.  But because there is "no enforceable

right to observe a particular number of animals," Habitat for Horses v. Salazar, 745 F. Supp. 2d

438, 448 (S.D.N.Y. 2010) (internal quotation marks omitted), this added difficulty does not

constitute irreparable harm to Plaintiffs.  And because it is reasonable to believe that some "649

---

[9] Even though the herds in the West Douglas HA and East Douglas HMA may be genetically
distinct today, see Pls.' Supplemental Ex. 2, ECF No. 17-2 (citing Defs.' Reply Supp. Cross-
Mot. Summ. J., Colo. Wild Horse & Burro Coal. v. Kempthorne et al., Civ. No. 06-1609 (D.D.C.
Aug. 13, 2008)), the Court has already explained that these horses appear to have descended
from the same "herd identified in 1974," Defs.' Opp'n 42.

horses will remain in the environs of the gather areas after the September gather is completed,"
Defs.' Opp'n 2, Plaintiffs' interest in observing these horses would remain protected.[10]

Finally, Plaintiffs contend that they would be irreparably injured by the emotional
distress associated with observing and contemplating the trauma and harm that the horses may
suffer during the upcoming gather.  Pls.' Mot. Prelim. Inj. 23–24.  The Court does not question
the sincerity or depth of the emotional connection that Plaintiffs feel with these horses, nor does
it discount the sadness that Plaintiffs have experienced in watching horses being gathered in the
past.  Plaintiffs' reliance on emotional distress as a form of irreparable injury, however, is
misplaced.  The cases that Plaintiffs cite for support involve the government taking action to *kill*
large numbers of animals.  See Fund for Animals v. Norton, 281 F. Supp. 2d 209, 222 (D.D.C.
2003) (describing the harm that plaintiffs would experience from contemplating the killing of
525 mute swans); Fund for Animals v. Clark, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (describing the
harm that plaintiffs would experience from "seeing or contemplating . . . bison being killed in an
organized hunt").  Here, by contrast, BLM does not intend to kill any healthy animals.  And to
the extent that BLM's actions do endanger wild horses, the risk of death or serious injury to the
gathered horses appears to be quite low.  See Pls.' Mot. Prelim. Inj. 25 (describing the
unintended death of one horse during a gather in 2010); Prelim. Inj. Hr'g Tr. 54:9-11 ("For

---

[10] Although Plaintiffs speak in terms of "permanent injury," Pls.' Mot. Prelim. Inj. 27, it appears
that BLM could potentially, albeit at great expense, return any gathered horses to the range
before they were sold or adopted.  Tel. Conf. of Sept. 9, 2015.  Both sides agree that returning
the gathered horses to the wild would cause the horses significant stress, id., and it is unclear
how feasible such an operation would be.  BLM has, however, laid out in prior litigation the
process by which it might go about returning gathered horses to the wild if a court ordered it to
do so.  Decl. of Francis G. Ackley, Col. Wild Horse & Burro Coal. v. Salazar, Civ. No. 10-1645
(D.D.C. Dec. 22, 2011), ECF No. 47-2 (describing the process of sorting, quarantining, treating,
feeding, and shipping wild horses from long-term holding facilities back to the wild).  The Court
need not decide this issue, however, given its finding that any injury Plaintiffs may suffer is not
irreparable regardless of whether the horses may be returned.

[BLM's] particular gather scenarios," the mortality rate for horse gathers is typically "about 1 percent and less."). Therefore, Plaintiffs' observation or contemplation of the stress and small risk of physical harm that the horses might suffer while being gathered—sincere as it might be—does not rise to the level of a cognizable, irreparable injury.

Ultimately, Plaintiffs' continued ability to view wild horses in both the West Douglas HA and the East Douglas HMA—and the lack of a legally protected right not to contemplate the effects on wild animals of BLM's efforts to remove them humanely—lead the Court to conclude that Plaintiffs have not met their burden to demonstrate a likelihood of irreparable injury.

### C.    Balance of Equities and the Public Interest

A party seeking a preliminary injunction must demonstrate both "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. "These factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Plaintiffs contend that they will "suffer a serious and irreparable injury" once the gather is completed, that the public has a general interest in compliance with the law by public officials, and that any harm to BLM from a delay will be minimal or nonexistent. Pls.' Mot. Prelim. Inj. 28–29. To support their claim that BLM is unlikely to suffer harm from a preliminary injunction, Plaintiffs point to BLM's history of postponing or cancelling gathers, specifically in the West Douglas HA, during prior litigation. Id. at 29. Defendants contend that delaying the scheduled gather would allow the wild-horse population to expand, intensifying the deterioration of vegetation and other elements of the range and potentially imperiling the wild-horse population as a whole. Defs.' Opp'n 44–45. Defendants further maintain that any additional delay would result in the loss of staff time and resources that BLM has invested in this scheduled gather, hurt the contractors and local businesses that are supporting the gather

operation, and generally reduce the likelihood of a successful gather.  Id. at 45; Walter Decl.

¶ 20.  Because of the financial and logistical impact on BLM of delaying the gather and the

reduced likelihood of a successful gather at a later time, the Court finds that the balance of

equities and the public interest favor the Defendants.

Plaintiffs understate the harm to Defendants from delaying the gather.  BLM may have

delayed gathers in the past while litigation has proceeded, see Pls.' Mot. Prelim. Inj. 29, but that

does not change the fact that BLM stands to lose its substantial investment of staff time and

resources in this gather, and may well have to wait months to schedule another one.  Walter

Decl. ¶ 17 ("Scheduling a gather is extremely difficult because there are only three qualified

contractors and BLM has had to work around the most popular hunting seasons during gather

operations.").  BLM explains that if the start date of the gather were delayed and the time for the

gather shortened, it would most likely fail to reach its goal of removing 167 horses.  Id. ¶ 20.  If

the planned gather were postponed until October, it would conflict with big-game hunting

activities in the area.  Id. ¶ 19.  And if the gather were pushed into 2016, BLM might lack the

funding and available holding-facility space necessary to conduct the gather.  Id. ¶ 21.  Plaintiffs

do not seriously dispute these points.  In the meantime, the wild-horse populations in both the

West Douglas HA and East Douglas HMA would continue to grow and consume natural

resources, leading to further deterioration of the range.  Defs.' Opp'n 44.  That result would be

contrary to the public interest.  See Blake v. Babbitt, 837 F. Supp. 458, 459 (D.D.C. 1993)

("[T]he endangered and rapidly deteriorating range cannot wait.").

Plaintiffs contend that their irreparable injury and the public's interest in having public

officials comply with the law tip the scales in their favor.  As the Court has already observed,

however, any legally cognizable injury that Plaintiffs would suffer as a result of the planned

gather would be minimal, even if it were somehow irreparable.  And the Court has also found that Plaintiffs are unlikely to demonstrate that BLM has violated either the Wild Horses Act or NEPA, meaning that a preliminary injunction would have no effect on public officials' compliance with the law.  As a result, the equities on Plaintiffs' side appear slight, especially when compared with the public's interest in allowing BLM to carry out its mandate of "manag[ing] wild free-roaming horses" so as to "achieve and maintain a thriving natural ecological balance on the public lands."  16 U.S.C. § 1333.  All in all, the balance of equities and the public interest favor denying Plaintiffs' request for a preliminary injunction in this case.

## IV.   Conclusion

For the foregoing reasons, the Court concludes that Plaintiffs have not met their burden to establish each of the factors required to obtain a preliminary injunction of BLM's planned gather.  The Court will therefore deny Plaintiffs' Motion for a Preliminary Injunction.  An appropriate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:    September 15, 2015

# Appendix A

**Map 2. Original Wild Horse Inventory and Wild Horse Herd Units within the White River Resource Area, 1974**



# Appendix B

**Map 6. Current Piceance-East Douglas HMA, North Piceance HA, and West Douglas HA Boundaries**



# Appendix C

# WRFO 2011 vs. 2015 PEDHMA Analysis Areas



2011 Analysis Area
423,855.71 Acres

2015 Additional
Area
24,203.63 Acres

Miles

0   2.5   5   10

Total Acres
448059.34

N

White River Field Office
Colorado

**Legend**

**Roads**
— State
— County

**2011 Analysis Area**
☐ 2011 Analysis Area

**2015 Additional Area**
☐ 2015 Additional Area

**Land Status**
☐ BLM
☐ CDW
☐ County
☐ USFS
☐ NPS
☐ PRI
☐ STA

NATIONAL SYSTEM OF PUBLIC LANDS
U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Sources: BLM, USGS, CDOW, etc.

Disclaimer: Although the data presented within this map, and the map itself, have been processed successfully on computers of BLM, no warranty, expressed or implied, is made by BLM regarding the use of this map or the data represented, nor does the fact of distribution constitute or imply any such warranty.